Matter of Sarah H. v Jaiquon W. (2025 NY Slip Op 51912(U))

[*1]

Matter of Sarah H. v Jaiquon W.

2025 NY Slip Op 51912(U)

Decided on October 1, 2025

Family Court, Tompkins County

Miller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 1, 2025
Family Court, Tompkins County

In the Matter of a Custody Proceeding 
 Under Article 6 of the Family Court Act Sarah H., Petitioner,

against
Jaiquon W., Respondent.

Docket No. XXXX

Scott A. Miller, J.

Petitioner Sarah H. (hereinafter "the mother") and Respondent Jaiquon W. (hereinafter "the father") are the parents of the subject child (date of birth: XX/XX/19) (hereinafter "the child"). This is a proceeding pursuant to Family Court Act Article 6. This action commenced with the mother's filing of a modification petition on March 17, 2025.
A Fact-Finding Hearing was conducted by the Court on September 8, 2025, and September 18, 2025. The mother was represented by Attorney Lucy Gold, the father was represented by Attorney Justin Woods, and the child was represented by Attorney Elizabeth McGrath of Citizens Concerned for Children, Inc. The Court heard testimony from the child's teacher, the AFC office social worker, and the parties. Numerous exhibits were received into evidence. On September 25, 2025, the Court conducted a Lincoln Hearing with the child and the Attorney for the Child. The Court heard oral summations by counsel for the parties on September 18, 2025, and reviewed the final written summation by the Attorney for the Child [*2]dated September 26, 2025.
The Court searched the statewide registry of orders of protection, the Sex Offender Registry, and the Family Court's child protective records, and notified the parties and the attorneys of the results of these searches.
 PROCEDURAL HISTORY
On August 20, 2024, an Agreement and Order of Custody was entered on consent of the parties. Pursuant to the order, the parties shared joint legal custody, with the mother to have final decision-making in the event the parties could not arrive at a mutual decision. The mother had primary placement of the child, with the father to have parenting time every Tuesday overnight until Wednesday morning at the start of school/camp, every Saturday from 9:00 a.m. until 4:00 p.m., and every other Sunday from 9:00 a.m. until 4:00 p.m. The order contained provisions for the expansion of such visits based upon the father's work schedule and for modification of such visits as the parties may mutually agree. The order set forth other details such as shared time on holidays and access to educational and medical providers.
On March 17, 2025, the mother filed a modification petition seeking sole legal custody and seeking to modify the father's parenting time to every other weekend. On March 27, 2025, the father filed his own modification petition seeking an additional weekly overnight visit. On April 11, 2025, the mother filed an answer to the father's petition. On June 20, 2025, the mother filed a violation petition. On August 1, 2025, the mother filed an Order to Show Cause seeking suspension of the father's overnight visits; the Court granted the mother's requested temporary relief and suspended the father's overnight visits pending the Fact-Finding Hearing.

FINDINGS OF FACT
The Court found the mother, the teacher, and the social worker to be completely credible. By contrast, the Court found the father to be devoid of credibility, offering absurd and self-contradictory testimony while defiantly talking over the attorneys who attempted to cross-examine him.
The mother is a fit, stable, and loving parent. She keeps a clean, safe, and appropriate home. She works full-time and meets all of the child's needs including buying the child's clothing, shoes, and school supplies. The father does not pay the mother any child support. He receives public assistance. He is suing the mother for the child tax credit she received in 2024. Although the father has a car, he insists that the mother provide all transportation for his visits. The mother makes and attends all of the child's medical appointments. The father has never asked the mother for information about the child's doctor or dentist appointments. The mother attends all school events to which families are invited. The father has never attended a school event or parent-teacher conference. The mother engages the child in fun, age-appropriate activities such as visiting parks and museums. The child is smart, kind, and creative.
On numerous occasions, the father failed to abide by the Agreement and Order of Custody by refusing to return the child to the mother on Sundays at 4:00 p.m. He would then bring the child to school the following morning late, in dirty clothes, and without her backpack. On one such occasion on March 4, 2025, he at first told the mother he was not going to bring the child to school the following day but then did so anyway—without informing the mother. On a different Sunday on June 8, 2025, the father failed to respond to the mother all day, failed to show up for the exchange at 4:00 p.m., and kept the child overnight without communicating his intention, prompting the mother to call the police for a welfare check. (Petitioner's Exhibit 5).
When the father does communicate with the mother, he is rude and demanding. On [*3]March 4, 2025, when the father declared the child would not attend school the following day, the mother asked if the child was sick and the father responded, "of u yes." (Petitioner's Exhibit 4). Later in the conversation, he ordered, "Stop questioning me n do as u r instructed plz." (Petitioner's Exhibit 4). He is sarcastic ("You so smart," Petitioner's Exhibit 7) and defiant ("No i [sic] want to see my child/ when ru bringing me child," Petitioner's Exhibit 8) towards the mother. This discourtesy is consistent with the testimony of the child's kindergarten teacher that when she introduced herself to the father and reached out her hand to shake his, he rudely turned his body away from her.
When the child is in the father's care, there are few rules. The five-year-old child does whatever she wants. She is not fed properly, and she stays up very late at night. She returns to her mother hungry and tired. The child often hangs out for many hours at the Commons Convenience (formerly called Zaza Smoke Shop) where the father either works or "volunteers" (the Court is uncertain of his actual employment status there, if any, due to his shifting testimony). The store sells cigarettes and paraphernalia for smoking tobacco and marijuana. When with the father at the "smoke shop," as the child calls it, she plays on her tablet for long periods of time and eats candy for lunch. The father admitted he has never looked at the school material in the child's backpack. The father swears around the child. The father has been regularly using marijuana since he was 15 years old. He smokes marijuana around the five-year-old child. He does not believe it is a mind-altering substance or that it poses a threat to the child. He does not believe his use of marijuana impacts the way he parents the child. On the first day of trial, the father came to court smelling strongly of marijuana. He admitted to having smoked marijuana earlier that morning.
The father resides in Asteri, a subsidized housing project in the City of Ithaca. The building has been riddled with problems since its opening including multiple fires and mental health calls throughout the night. The common areas of the complex are littered with garbage. The elevator floors are covered in puddles of urine. The stairwells are filled with active drug users and used hypodermic needles. The father's apartment is extremely cluttered and piled high with boxes and other items despite the father having moved in over one year ago. A small pathway leads through the home. The surfaces are covered. For many months, the child reported she and/or the father were unable to utilize the bathroom sink, kitchen stove, and child's bedroom due to an overabundance of stuff in the way. There is no place to sit down as the chairs and couches are buried beneath belongings. There is no floor room in either the child's bedroom or the living room for the child to utilize her toys or engage in activities. 
When the father brought the child to school on Wednesday or Monday mornings following his overnights, the child was very late, often arriving between 9:00 and 10:00 a.m. and once arriving at 12:10 p.m. (Petitioner's Exhibit 3). The child would miss breakfast, morning work, morning meeting, and part of her "special." She was usually tired, sad, and emotionally dysregulated. The child appeared confused, lethargic, and "out of it" for anywhere from a few hours to the rest of the school day. The child would smell strongly of marijuana; the coatroom would fill with the odor of marijuana after she would hang up her coat. Her teacher believes the five-year-old child was under the influence of marijuana numerous times when brought to school by her father due to her sluggishness, inability to pay attention to her surroundings, and emotional upset.
The father's testimony was bizarre and strained credulity. For example, the father testified that in addition to living in Asteri, he also worked there. Within the span of several [*4]minutes, he testified that: (1) he is the superintendent of Asteri; (2) he is a custodian at Asteri; (3) he was fired unjustly from Asteri; (4) he got laid off from Asteri for no reason; (5) he is actually still employed at Asteri; (6) he could still work at Asteri "right now" if he wants to; and (7) he is suing Asteri because they stole his rent money. His testimony regarding his employment/"volunteer" work left the Court confused and suggested that the father was engaging in both tax evasion and welfare fraud. He gave evasive and contentious answers. He was not credible.

CONCLUSIONS OF LAW
A "party seeking to modify an existing custodial arrangement" must "demonstrate, as a threshold, that 'there has been a change in circumstances since the prior custody order significant enough to warrant a review of the issue of custody to ensure the continued best interests of the children' (Matter of Tyrel v. Tyrel, 132 AD3d 1026, 1026 [2015] [internal quotation marks and citations omitted]; see Matter of Gerber v. Gerber, 133 AD3d 1133, 1135 [2015])." Matter of Harrell v. Fox, 137 AD3d 1352, 1354 (3rd Dept. 2016). "[I]t is only when this threshold showing has been made that Family Court may proceed to undertake a best interest analysis" (Matter of Meyer v Lerche, 24 AD3d 976, 977 [2005])." Matter of Kerwin v. Kerwin, 39 AD3d 950, 951 (3rd Dept. 2007). If the petitioner meets that burden, he or she must then demonstrate that the "best interests of the child[ren] would be served by modification of that order (Matter of David ZZ. v. Suzanne A., 152 AD3d 880, 881, 58 N.Y.S.3d 711 [2017] [internal quotation marks and citations omitted]; accord Matter of Heather U. v. Janice V., 160 AD3d 1149, 1150, 74 N.Y.S.3d 410 [2018] )." Beers v. Beers, 163 AD3d 1197, 1198 (3rd Dept. 2018).
The mother has met her burden of showing a significant change in circumstances since issuance of the August 20, 2024 Agreement and Order of Custody. The father's repeated refusal to follow the order and return the child to the mother at the designated time, his repeated refusal to communicate with the mother regarding the child's whereabouts, his inability to get the child to school on time following his overnights, his marijuana usage around the child causing her to arrive at school under the influence of marijuana and smelling strongly of it, and his unsafe and inappropriate housing all constitute a significant change in circumstances.
Turning now to whether it would be in the best interests of the child to modify the prior order, "[a]ny court in considering questions of child custody must make every effort to determine 'what is for the best interest of the child, and what will best promote [his or her] welfare and happiness' [internal citations omitted]." Eschbach v. Eschbach, 56 NY2d 167, 171 (NY 1982). "In determining the best interests of a child, a court must consider various factors, including 'the parents' ability to provide a stable home environment for the child, the child's wishes, the parents' past performance, relative fitness, ability to guide and provide for the child's overall well-being, and the willingness of each parent to foster a relationship with the other parent' [internal citations omitted]." Herrera v. Pena-Herrera, 146 AD3d 1034, 1035 (3rd Dept. 2017).
Further, the courts have held that where there is an "acrimonious relationship" and poor communication between the parties, joint custody is inappropriate. See Shearer v. Spisak, 90 AD3d 1346, 1347 (3rd Dept. 2011); Tylaeya C. v. Karl S., 187 AD3d 402 (1st Dept. 2020). In such cases, it is appropriate to award sole custody to the parent who has been the "primary caregiver" to the [children] and to the parent who has "demonstrated a willingness to foster a relationship between the [children] and [the other parent] " Keen v. Stephens, 114 AD3d 1029, 1031 (3rd Dept. 2014); Tylaeya C. v. Karl S., 187 AD3d 402 (1st Dept. 2020). In [*5]considering a party's willingness to promote a relationship between the children and the other parent, the court may take into account the party's poor communication with the other parent, "disparaging treatment of the [other parent] as reflected in text messages," and "failure to take responsibility for his [or her] actions." Cameron ZZ. V. Ashton B., 183 AD3d 1076 (3rd Dept. 2020).
Based upon all of the evidence, the Court must grant sole legal custody and continued primary placement to the mother. Here there is an "acrimonious relationship" between the parties such that joint custody is inappropriate. As the primary caregiver to the child, the mother has provided a safe, stable, and healthy home environment for the child. She is the only parent willing to foster the child's relationship with the other parent. The father's refusal to communicate with the mother about the child's whereabouts and his blatant disrespect towards the mother have made it clear that modified joint custody is no longer appropriate and that it is in the child's best interests for the mother to be granted sole legal custody and continued primary placement.
Further, the Court finds it is not in the child's best interests to have overnight visitation with the father at this time. The child does not receive proper food or sleep in his care. The father is either unwilling or unable to get the child to school on time in the mornings following his overnights. He smokes marijuana around the child causing the five-year-old to show up to school under the influence of marijuana and smelling strongly of it. His apartment building is unclean and dangerous for the child. The father's apartment is inappropriate and unsafe for the child due to his hoarding which prevents the child from utilizing important facilities and spaces. It is not in the child's best interests to spend any time at the father's apartment building or apartment in their current states.
The mother's modification petition is GRANTED. The father's modification petition is DENIED. The mother's violation petition is GRANTED. It is hereby:
ORDERED, that the mother shall have sole legal custody and primary placement of the subject child; and it is further
ORDERED, that the father shall have full, complete, and independent access to the medical and educational records and providers of the subject child and may attend all academic and recreational activities to which parents are usually invited; and it is further
ORDERED, that the father's overnight visitation with the child is suspended and the parties are prohibited from negotiating overnight visitation on their own; and it is further
ORDERED, that the father shall have visitation every Saturday from 10:00 a.m. until 6:00 p.m. The mother will drop off the child to the father at XXXX at 10:00 a.m. If the father is not present by 10:30 a.m., he will have forfeited his visit. The father must bring the child to XXXX by 6:00 p.m. for pick up by the mother; and it is further
ORDERED, that in the event a birthday party or other important event for the child is scheduled for a Saturday, the mother shall provide the father at least five (5) days notice about the conflict and notify the father that the mother will be taking the child to the event. The mother will communicate to the father the modified time(s) for the Saturday visit, and she may but is not required to offer make-up time to the father; and it is further
ORDERED, that the father shall not bring the child into Asteri; and it is further
ORDERED, that the father shall not bring the child into Commons Convenience; and it is further
ORDERED, that the father shall not smoke marijuana, use any drugs, or cause the child [*6]to smell of marijuana during his parenting time; and it is further
ORDERED, that all communication between the parties shall take place through a parenting app agreed upon by the parties through their attorneys; if they cannot agree within five (5) days of this order, it shall be AppClose; and it is further
ORDERED, that any face-to-face communication between the parties shall be kept to a minimum; and it is further
ORDERED, that both parties shall be respectful in all communication with one another and shall not engage in any harassing communication or conduct towards one another; and it is further
ORDERED, that the father shall complete the Parents Apart program through the Cornell Cooperative Extension; and it is further
ORDERED, that the parties shall share time with the child on holidays as they mutually agree; and it is further
ORDERED, that the parties shall keep each other informed of their contact information; and it is further
ORDERED, that if the child is seriously ill or injured then the party with the child shall immediately contact the other party; and it is further
ORDERED, that in regulating their own behavior, the parties shall consider the following "rights of a child whose parents are separated (adapted from the Parent's Handbook of the New York State Parent Education and Awareness Program — 2016):
1. The right not to be asked to "choose sides" between their parents.
2. The right not to be told any details of the legal proceedings going on between their parents.
3. The right not to be told "bad things" about the other parent's personality or character.
4. The right to privacy when talking to the other parent on the telephone.
5. The right not to be interrogated by one parent about the other parent.
6. The right not to be asked to carry messages between parents.
7. The right not to be asked by one parent to tell the other parent untruths.
8. The right not to be used as a confidant regarding adult matters.
9. The right to express feelings, whatever those feelings may be.
10. The right to choose not to express certain feelings.
11. The right to be protected from parental "warfare."
12. The right not to be made to feel guilty for loving both parents.
Enter: October 1, 2025
Ithaca, New York
Hon. Scott A. Miller
Family Court Judge